THE CITY OF SPRINGFIELD (Police Department), Plaintiff-Appellant, v. SPRINGFIELD POLICE BENEVOLENT AND PROTECTIVE ASSOCIATION, UNIT No. 5, Defendant-Appellee.

Fourth District   No. 4—91—0648

Opinion filed May 28, 1992.

James K. Zerkle, Corporation Counsel, of Springfield (Jill Leka, Assistant Corporation Counsel, of counsel), for appellant.

Ronald J. Stone, of Stratton, Dobbs, Nardulli & Lestikow, of Springfield, for appellee.

JUSTICE LUND delivered the opinion of the court:

The genesis of this appeal was conduct by John Workman, a police officer of the City of Springfield (City), which resulted in discipline. After specific discipline was accepted, the City refused to assign Workman to the third shift. One year later, his request to return to the night shift was denied and a grievance was filed which resulted in mandatory arbitration under the terms of the collective-bargaining agreement. The arbitrator entered an award in favor of Workman, finding there was insufficient reason for continued disciplinary action. With no adequate reason to support its disciplinary action, the City's refusal to assign Workman to the third shift was held to be arbitrary and capricious and, therefore, without just cause.

The City submitted an application in the circuit court to vacate the arbitration award (Ill. Rev. Stat. 1989, ch. 10, par. 112), claiming that the arbitrator exceeded his authority and, in the alternative, that the award violated public policy. The circuit court denied the application. On appeal, the City asserts only the single claim that the arbitrator's award should be vacated because it violates public policy.

We now discover that Workman was reassigned to the third shift before the trial court action and evidently before the arbitration award was entered. Normally, consistent with our duty to resolve actual, live controversies, and not those as to which our ruling would be advisory only, we would hold that the issue giving birth to

this cause of action is now moot and the appeal should be dismissed. (See *People v. Redlich* (1949), 402 Ill. 270, 278-79, 83 N.E.2d 736, 741; *People ex rel. Wallace v. Labrenz* (1952), 411 Ill. 618, 622, 104 N.E.2d 769, 772.) However, both parties by stipulation have suggested the issue of monetary damages was remanded by the arbitrator and is yet to be determined, pending the outcome of this appeal.

FACTS OF THIS CASE

Workman has been a police officer with the City of Springfield for approximately 10 years. In December 1987, Workman received a one-day suspension for excessive use of force when he pushed someone three times, allegedly without justification or reason. He was cited for violation of section 1.28 (use of force) of the departmental rules and regulations.

In October 1988, during the course of the arrest of Fred Mears, he plunged his nightstick into Mears' abdomen with such force as to double him over and knock him backward. Despite the fact that Mears was handcuffed with both hands behind his back during these events, Workman continued to swing his nightstick, striking Mears an additional 8 to 10 times. For violation of police department regulations sections 1.28 (use of force) and 1.29 (treatment of persons in custody) and civil service rule 48(c) (offensive conduct in treatment of fellow employees or public), the following actions were imposed in January 1989: (1) a 10-working-day suspension; (2) removal from the position of field training officer; (3) a transfer from the third watch (night shift) to the first watch (day shift); and (4) an order to contact the Employee Assistance Program (EAP) to receive counseling. No grievance was filed in connection with this disciplinary action. A lawsuit against the City was threatened over this second use-of-force incident, but it was settled due to the City's concern that liability could increase if the matter went to court.

While the initial disciplinary documents do not expressly state that the shift reassignment was temporary, the record indicates it was of a trial nature. Three months after the reassignment, Chief Walton recommended that Workman be returned to the third shift, but the director of public safety disagreed. Citing Workman's serious problems dealing with people, and the greater likelihood of confrontational situations on the third shift, he ordered that Workman be kept on the first shift.

Approximately one year later (December 1989), Workman requested an assignment to the third watch (11 p.m. to 7 a.m.), effec-

tive January 1990, as a part of the annual shift selection process provided for in the collective-bargaining agreement. Walton denied the request on the basis of three factors. First, the two prior incidents of excessive force were an indication of violent propensities which could result in civil liability if precautions were not taken. Both prior incidents occurred on the third watch, and it is generally acknowledged that use-of-force occurrence is less likely on the first shift than on the third. Second, Workman had been referred for additional counseling in conjunction with the second use-of-force incident, and the department had been informed (erroneously) that he refused counseling. Third, he displayed a bad attitude during the internal affairs investigation of his excessive use of force.

Workman filed a grievance. In response, Walton offered to return him to the third shift in May 1990, on the condition that Workman receive no sustained internal affairs complaints in the interim. The Police Benevolent and Protective Association Unit No. 5 (the union) was not satisfied and continued to pursue the grievance. At this point, the director of public safety denied the grievance and overrode the chief's recommendation to return Workman to the third shift in May, citing potential civil liability to the City for doing so. It was decided to keep Workman on the first shift for one additional year, but this limitation was apparently not communicated to either Workman or the union.

The union advanced the matter to arbitration, and a hearing was held on August 30, 1990. The parties stipulated to the following statement of the issue: Did the City violate the collective-bargaining agreement when it failed to allow Workman his shift selection effective January 1, 1990?

The City asserted that because there is no contractual prohibition against the employer's denying a shift selection, there was no violation of the collective-bargaining agreement. Its responsibility was therefore met when the grievant was allowed to participate in the shift selection process. The arbitrator rejected this assertion and categorized the shift reassignment as a form of disciplinary action. As such, the action was subject to article 14.1(b) of the agreement, which states that no officer shall be disciplined in any manner without just cause. The City's reasons for rejecting the officer's shift selection were then evaluated under the just-cause standard, which the arbitrator defined as a prohibition against arbitrary and capricious conduct by employers.

Both parties agreed that situations calling for the use of physical force are more likely to occur on the third shift than they are

on the first. The arbitrator therefore accepted "as fact" the notion that a person with a propensity for violence does not belong on the third shift. However, the only testimony on record regarding Workman's psychological condition was that of his EAP counselor, who gave him a clean bill of health. Based on the counselor's finding that Workman had no psychological problem, the arbitrator made a "finding of fact" that Workman did not have a propensity for violence. Workman's refusal to accept counseling was dismissed as erroneous information, and his attitude during the internal affairs investigation was held to be an insufficient reason for continued disciplinary action. With no adequate reason to support its disciplinary action, the City's refusal to assign Workman to the third shift was held to be arbitrary and capricious and, therefore, without just cause.

The City submitted an application to vacate to the circuit court, claiming that the arbitrator exceeded his authority and, in the alternative, that the award violated public policy. The circuit court denied the application, and this appeal followed.

ARBITRATION UNDER COLLECTIVE-BARGAINING AGREEMENTS

Rather than a mere substitute for litigation, arbitration is considered a necessary complement to negotiation and an expedient in averting economic strife between the parties. (*Board of Trustees of Community College District No. 508 v. Cook County College Teachers Union, Local 1600* (1979), 74 Ill. 2d 412, 419, 386 N.E.2d 47, 50, citing *United Steelworkers of America v. Warrior & Gulf Navigation Co.* (1960), 363 U.S. 574, 578, 4 L. Ed. 2d 1409, 1415, 80 S. Ct. 1347, 1351.) In a recent case, the Supreme Court reaffirmed their commitment to the *Steelworker* line of cases and summarized the standard of review:

> "Because the parties have contracted to have disputes settled by an arbitrator chosen by them rather than by a judge, it is the arbitrator's view of the facts and of the meaning of the contract that they have agreed to accept. Courts thus do not sit to hear claims of factual or legal error by an arbitrator as an appellate court does in reviewing decisions of lower courts. \*\*\* [T]he arbitrator's award settling a dispute with respect to the interpretation or application of a labor agreement must draw its essence from the contract and cannot simply reflect the arbitrator's own notions of industrial justice. But as long as the arbitrator is even arguably construing or applying the contract and acting within the scope of

his authority, that a court is convinced he committed serious error does not suffice to overturn his decision." *United Paperworkers International Union v. Misco, Inc.* (1987), 484 U.S. 29, 37-38, 98 L. Ed. 2d 286, 299, 108 S. Ct. 364, 370-71.

ARBITRATOR DECISION

The arbitrator's decision included the following:

"[T]he Arbitrator has concluded that the Employer's denial of the Grievant's shift selection did constitute disciplinary action and is, therefore, subject to the just cause standard. And the just cause standard has been well-defined over the last two decades. It includes a prohibition against arbitrary and capricious conduct by employers, thus rendering moot the Employer's argument here that those terms in Article 15.4 do not apply to this case.

But was the Employer's denial of the Grievant's shift selection in December, 1989, arbitrary and/or capricious? The record has convinced the Arbitrator that it was. First, the Employer was simply incorrect in its conclusion that the Grievant refused the referral of his E.A.P. counsellor Michael Stratton for further professional assistance. According to Stratton's testimony, his two one-hour sessions with the Grievant convinced him that the Grievant had no serious emotional difficulty, no substance abuse problem, and no despondency of any sort. It was Stratton's conclusion that the Grievant 'could do his job with no problems.' Stratton further advised the Grievant that he could 'see someone (meaning a therapist and at his own expense) on a continuing basis to enlarge his life,' but that he was not required to do so. The Grievant declined. This scenario as described by E.A.P. Counsellor Stratton himself is a far cry from the Employer's mistaken conclusion that the Grievant refused to follow an E.A.P. referral for additional counseling.

A second reason given by the Employer for denying the Grievant's shift selection was his 'bad attitude' during an Internal Affairs investigation. It is the Employer's obligation to prove the merit of that allegation, and the record contains insufficient evidence to do so. No transcript or tape of the comments allegedly made by the Grievant during that investigation was introduced, nor was there any testimony from the Internal Affairs Officer(s) who conducted the interview. Yet, according to then Chief Michael Walton, he had listened to a

tape of the interview and concluded that the Grievant had a bad attitude. The Grievant denies displaying a bad attitude during that interview. Without hearing the tape itself, the Arbitrator must resolve this particular point against the party raising the allegation—the Employer. Walton's hearsay testimony is simply not enough to carry the Employer's burden of proving that its allegation was meritorious. Besides, Walton also testified that 75% of all officers called in for an Internal Affairs interview become defensive and get upset. Even if the Grievant did ruffle his feathers a bit during his own interview, such behavior does not necessarily mean he had a bad attitude in general.

The Employer's third reason for denying the Grievant's shift selection was related to the two disciplinary incidents involving the Grievant's use of force and its conclusion that the Grievant has a propensity for violence. Both parties agree that situations calling for the use of physical force are more likely to occur on the 3rd shift than they are on the 1st. The Arbitrator therefore accepts as fact the notion that a person with a propensity for violence does not belong on the 3rd shift. But does the Grievant have a 'propensity for violence?' The only expert testimony in the record about the Grievant's psychological condition was that presented by former E.A.P. Counselor Stratton, who indicated that the Grievant had no psychological problem which would prevent him from doing his job. Certainly a 'propensity for violence' would prevent a police officer from performing his job properly, and if Stratton thought the Grievant suffered from such a condition it is reasonable to expect he would not have given him a clean bill of psychological health.

There is yet another reason the Arbitrator has concluded that the Employer did not have just cause to discipline the Grievant. In effect, the discipline was not given a fixed duration. The Employer has taken the position that the Grievant would not be given a 3rd shift assignment until it was ready to give it to him. Such an ill-specified sanction against the Grievant was unreasonable and repugnant to the notion of corrective discipline in general. In a sense, the Employer suspended the Grievant from the 3rd shift for an indefinite time period for arbitrary reasons. Furthermore, it argued that its decision to do so was not disciplinary and, therefore, it did not need to base the decision on a just cause. In the opinion

of the undersigned such circumstances placed the Grievant in an untenable situation not contemplated by the parties when they negotiated the relevant sections of the collective bargaining agreement."

## PUBLIC POLICY

■ An arbitrator's award may not stand if it results in the contravention of paramount considerations of public policy. *Board of Trustees*, 74 Ill. 2d at 423-24, 386 N.E.2d at 52.

■ We do not hesitate in saying that the use of *excessive* force by law enforcement officers is against public policy. When an arbitrator's decision is in conflict with this policy, it will be set aside. However, the record indicates the arbitrator's award in this case was based upon the particular facts relating to Workman's conduct and completed discipline. The public policy issue is not clearly intertwined with the arbitrator's decision.

## APPELLATE DECISION

■ We recognize that governmental authorities have the power to discharge those who batter prisoners. (*Department of Central Management Services v. American Federation of State, County & Municipal Employees* (1990), 197 Ill. App. 3d 503, 514, 554 N.E.2d 759, 766.) The present case is distinguished by the fact that Workman was not discharged and his shift reassignment was never intended to be permanent. The evidence does not justify our overruling the arbitrator's determination that the City's action was disciplinary in nature and that discipline of indeterminate duration is a violation of the contract.

Our power of review is sufficiently restricted when considering an arbitrator award so that the award in the present case must be affirmed.

Affirmed.

GREEN, P.J., and COOK, J., concur.